UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------X

UNITED STATES OF AMERICA,

Dkt. No. 16-CR-190

v.

ALEKSANDR BURMAN,

Defendant.

-----------------------------------------------------X


**<u>SENTENCING MEMORANDUM</u>**


Barry Zone, Esq.
Edward V. Sapone, Esq.
Chase S. Ruddy, Esq.
Sapone & Petrillo, LLP
*Attorneys for Defendant*
*Aleksandr Burman*
One Penn Plaza, Suite 5315
New York, New York 10119
Telephone: (212) 349-9000
E-mail: edward@saponelaw.com

# TABLE OF CONTENTS

**Page**

I.     Introduction ................................................................................................ 1

II.    Case History ................................................................................................1

III.   Sentencing Guidelines Calculations .........................................................3

IV.    An Overview of Sentencing Post-*Booker* ..................................................5

V.     Mr. Burman's History & Characteristics, and Nature &
       Circumstances of the Offense (§3553(a)(1)) .............................................6

       a.     *History & Characteristics* ...............................................................6

       b.     *Nature and Circumstances of the Offense* .....................................14

VII.   Remaining Factors of 18 U.S.C. §3553(a) ..............................................18

       a.     *The Need for the Sentence Imposed to Reflect the Seriousness
              of the Offense, to Promote Respect for the Law, to Provide
              Just Punishment for the Offense, and to Avoid Unwarranted
              Sentence Disparities* .......................................................................18

       b.     *The Requested Sentence Can Provide Adequate
              Deterrence, and Protect the Public from Future
              Offenses by Mr. Burman* ..................................................................20

       c.     *Vulnerability Mr. Burman Will Face
              in Prison Due to His Age and Health* ..............................................23

VI.    Conclusion ................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)...................................................................................5

*Nelson v. United States*,
    129 S.Ct. 890 (2009)................................................................................5

*United States v. Adelson*,
    441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006)...........................................17

*United States v. Booker*,
    543 U.S. 220 (2005)................................................................................5

*United States v. Cavera*,
    550 F.3d 180 (2d Cir. 2008)...................................................................5

*United States v. Corsey*,
    723 F.3d 366, 380 (2d Cir. 2013).........................................................17

*United States v. Gupta*,
    904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012)..........................................17

**Statutes**

18 U.S.C. §§1343.............................................................................................1

18 U.S.C. §§1347.............................................................................................1

18 U.S.C. §§1349.............................................................................................1

18 U.S.C. §§3147.............................................................................................1

18 U.S.C. §3553(a) ................................................................................. *passim*

U.S.S.G. §2B1.1...........................................................................................3, 4

U.S.S.G. §2X1.1..............................................................................................3

U.S.S.G. §3B1.1..............................................................................................4

U.S.S.G. §3C1.3 ...................................................................................................4

U.S.S.G. §3D1.2 ..................................................................................................3

U.S.S.G. §3E1.1 ...................................................................................................4

**Other Authorities**

Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom, "Criminal
    Deterrence and Sentence Severity: An Analysis of Recent Research," Oxford: Hart
    Publishing (1999) ....................................................................................21

Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and
    Terminally Ill Inmates," United States Department of Justice, National
    Institute of Corrections (February 2004) ...............................................23, 24, 25

Greenpeace International, The Chernobyl Catastrophe: Consequences on Human
    Health (2006), http://www.greenpeace.org/international/Global/international/
    planet-2/report/2006/4/chernobylhealthreport.pdf ...................................16

Sarah Kleinfeld, Health Consequences of Chernobyl (2009),
    http://faculty.virginia.edu/metals/cases/kleinfeld3.html ..........................16

United States Sentencing Commission Sourcebook of Federal Sentencing
    Statistics for Fiscal Year 2015 ................................................................20

Valerie Wright, Ph.D., *Deterrence in Criminal Justice*, The Sentencing Project
    (November 2010) .....................................................................................21

World Health Organization: Health effects of the Chernobyl accident: an overview (2006),
    http://www.who.int/ionizing_radiation/chernobyl/backgrounder/en/......................16

## I.      Introduction

Defendant Aleksandr Burman is scheduled to be sentenced on May 3, 2017, at 10:00 a.m. We offer this memorandum to assist the Court in arriving at a sentence sufficient but not greater than necessary to achieve the objectives of sentencing.

At the outset, Mr. Burman wants the Court to know that he recognizes how serious his offense is and that he has no one to blame but himself. He formally accepted responsibility on March 18, 2016, to counts one, two and three of Information (16-CR-190) charging him with conspiracy to commit healthcare fraud and wire fraud (18 U.S.C. §§1347, 1343 & 1349), healthcare fraud (18 U.S.C. §1347), and committing an offense while on release (18 U.S.C. §3147).

The plea agreement includes an advisory sentencing range of 135 to 168 months' incarceration (adjusted offense Level 32, CHC II). The Probation Office calculates an advisory sentencing range of 168 to 210 months' incarceration (level 34, CHC II).  This includes a two-level loss amount increase for losses calculated after Mr. Burman entered his plea.  The government does not ask the Court to find these additional losses. (*See* PSR pg. 9, FN2). Further, there is no mandatory minimum term of incarceration.

While Mr. Burman's offense is no doubt serious, we respectfully ask the court to impose a non-guidelines sentence of 48 months' incarceration, which after careful consideration of the factors of 18 U.S.C. §3553(a), we believe to be reasonable and sufficient.

## II.      Case History

In 2014, a co-conspirator of Mr. Burman's was arrested. She contacted Mr. Burman to ask him what to do.  He helped her hire a lawyer and told her to do whatever was best for her,

including cooperating with the government. Afterwards, Mr. Burman's attorney, Barry S. Zone, Esq., started a dialogue regarding Mr. Burman's criminal exposure, and whether Mr. Burman might be of assistance to the government.

Mr. Burman was clear from the beginning: he wished to accept responsibility for his misconduct and help the government. Mr. Zone then remained in contact with the government throughout the following two years, during which time Mr. Zone met with the government four times and Mr. Zone and Mr. Burman met with the government twice so that Mr. Burman could proffer. Eventually, the government informed Mr. Burman that it had made the decision not to pursue a cooperation agreement with him. The government and Mr. Zone then began to discuss a disposition of the case, and Mr. Burman pleaded guilty 10 days after his initial presentment.

Since then, Mr. Burman has attempted to sell his properties to satisfy the proposed restitution order. He was able to sell four properties, and he gave the government the proceeds of the sales totaling $1,700,300.00. Further, he agreed to forfeit to the government an additional 22 properties (*see* Amended Consent Order of Forfeiture) with an expected value exceeding $16 million.

Mr. Burman made a big mistake and he has learned a difficult lesson, one that will, as we explain below, cost him the best years left of his life, everything he and Marina own[1], and that will separate him from Marina, his son and daughter, and elderly parents.

A considerable portion of this memorandum concentrates on a discussion of Mr. Burman's extraordinary history and characteristics. *See* 18 U.S.C. §3553(a)(1). We ask Your Honor to consider, among other things, that:

> (1)  Mr. Burman is a 54 year-old defendant with serious medical conditions,
>      particularly for someone his age;

---

[1] Marina and Mr. Burman were married in 2004; they separated in 2010, and divorced in 2012. They have reconciled, plan to remarry, and again live as husband and wife.

(2)  he quickly accepted full responsibility for his misconduct;

(3)  he agreed to forfeit 22 properties which we believe will yield restitution of more than $16 million;

(4)  while he committed the instant offenses, he was under the grip of a long-standing battle with addiction to heroin and opioids;

(5)   he plays an important role in the lives of his children and elderly parents with whom he shares extremely close relationships;

(6)  his life leading up to the instant offense has often times been marked by extreme hardship and tragedy; and

(7)  he is a man with a generous and caring nature who has made tremendous contributions in the lives of many people in the community.

Ultimately, we believe that a sentence of 48 months' incarceration is reasonable in light of 18 U.S.C. §3553(a).


### III.      Sentencing Guidelines Calculations

*The Plea Agreement's Calculation*

Counts one, two and three are grouped, because (1) the total offense level is determined largely on the basis of the loss amount, and (2) count three embodies conduct that is treated as a specific offense characteristic ("SOC") or other adjustment to the guideline applicable to counts one and two.  S*ee* U.S.S.G. §§3D1.2(c) and (d).

| | |
|---|---:|
| Base Offense Level<br>[U.S.S.G. §§2B1.1(a)(2) & 2X1.1(a)] | 6 |
| Loss Was at Least $9,500,000<br>But Less Than $25,000,000<br>[U.S.S.G. §2B1.1(b)(1)(K)] | +20 |

3

| | |
|---|---|
| Healthcare Fraud Involving Loss to Government Health Care Program of More Than $7,000,000 But Less Than $20,000,000 [U.S.S.G. §2B1.1(b)(7)(A) & (B)(ii)] | +3 |
| Offense Committed While on Release [U.S.S.G. §3C1.3; 18 U.S.C. §3147] | +3 |
| Manager or Supervisor of Criminal Activity That Involved 5 or More Participants [U.S.S.G. §3B1.1(b)] | +3 |
| Timely Acceptance of Responsibility [U.S.S.G. §3E1.1] | <u>-3</u> |

**Total Adjusted Guidelines Offense Level**      **32**

Offense level 32, in criminal history category ("CHC") II, yields an advisory sentencing guidelines range of 135 months to 168 months of incarceration.

*The Probation Office's Calculation*

The Probation Office follows this same analysis with one notable difference: Probation's calculation includes an additional two levels for a higher loss amount. *See* U.S.S.G. §2B1.1(b)(1).  According to Probation, evidence of additional losses was developed after Mr. Burman entered into his plea agreement and pleaded guilty. While we would not take the position that Probation's calculation is an irrational application of the guidelines, the Government does not seek to try to prove these additional losses, and instead stands by the loss amount outlined in the plea agreement.

## IV.   An Overview of Sentencing Post-*Booker*

Since 2005, district courts have had wide discretion to impose non-Guidelines sentences, as long as they are within the range of reasonable sentences. *See United States v. Booker*, 543 U.S. 220, 226-227 (2005); *Gall v. United States*, 552 U.S. 38, 49, 62 (2007). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S.Ct. 890, 892 (2009); *see also United States v. Cavera*, 550 F.3d 180, 184 (2d Cir. 2008) (*en banc*) (confirming that district courts are no longer to presume Guidelines range sentences as reasonable). The district court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense" (*Cavera*, 550 F.3d at 184), and make an "individualized assessment based on the facts presented" (*Gall*, 552 U.S. at 597).

The touchstone of the sentencing court's individualized assessment is an analysis pursuant to 18 U.S.C. § 3553(a). The factors are:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3)   the kinds of sentences available;
>
> (4)   the kinds of sentences and the sentencing range established for: (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines;

     (5)     any pertinent policy statement – [...];

     (6)     the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

     (7)     the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Ultimately, of course, the overarching goal of sentencing is to satisfy the parsimony clause to ensure that a sentence is "sufficient, but not greater than necessary" to satisfy the purposes of sentencing under § 3553(a)(2).

### V.     Mr. Burman's History & Characteristics and Nature & Circumstances of the Offense (§3553(a)(1))

*a.*     *History & Characteristics*

At 54, Mr. Burman is the older of two children born to Konstantin and Adel Burman. His younger brother, Dmitry, age 48, is a medical doctor and lives in Toronto, Canada, with his family.

Mr. Burman was born into a Jewish family in soviet-era Ukraine. The political environment at that time was very anti-Semitic, and Mr. Burman's family suffered for it. Institutionalized discrimination was rampant within the government and almost all social institutions. Every employment and school application required the applicant to divulge whether he or she was a Jew; an answer of "yes" would exclude the applicant. Businesses were slow to hire Jews, and it was difficult to secure a decent job. Bullies in the schools and neighborhoods sought out Jewish children like Mr. Burman.

Notwithstanding the discrimination Mr. Burman and his family suffered, Mr. Burman's parents stressed education. Mr. Burman was a good student. He graduated high school in 1978, and three months later enrolled at the Kiev Technological Institute where he earned a BA in Refrigeration and Air Conditioning in 1981. Following his graduation, Mr. Burman was able to secure a job at a refrigerating equipment company. Mr. Burman's desire was to work in the field of economics, and in 1982 he enrolled at the University of Kiev to study economics. For two and a half years, from 1982 to 1984, he tried unsuccessfully to gain employment in the field of economics. As a Jew, the field simply was not available to him. So in 1984, Mr. Burman went to work for the Department of Transportation where he worked until 1986 when he earned a Master's degree from the University of Kiev in Economics. Notwithstanding Mr. Burman's efforts to work hard and better educate himself, he simply did not have opportunities in Ukraine.

To make matters more difficult, Mr. Burman's family lived only 65 miles from Chernobyl, the site of the catastrophic 1986 nuclear disaster. Many people in the area where the Burman family lived, including neighbors and friends, have been affected by the radiation produced from the nuclear fallout. And, Mr. Burman, and his parents, have had lingering health issues ever since Chernobyl.

As a result of the radiation, in 1986 Mr. Burman and his family were forced to leave Ukraine for Latvia where he was able to land a job with the National Educational Department in the Human Resources Department. He worked there from 1986 until 1992.  But, even there, he had to work harder and longer hours than the non-Jewish employees, and for one-third the pay. He was constantly reminded that, as a Jew, he could be fired at any time without cause.

In 1992, Latvia separated from the USSR, which led to a surge in Latvian nationalism and discrimination against all outsiders—especially Jews with Soviet backgrounds like the

Burmans. Mr. Burman had married his first wife, Lyudmila Grigotchuk, three years earlier in 1989, the same year his son Alexander was born. He worried for his young family, and the rent for their apartment suddenly increased by more than 500%, making it impossible to afford. Employment opportunities also dried up for non-Latvians. Mr. Burman's brother was forced from medical school into the army for a mandatory two years. The family once again found themselves confronted with a bleak future.

So, in 1992, Mr. Burman immigrated to the United States. He arrived on a visa, and immediately applied for permission for his family to join him and for permanent U.S. resident status. He remained here alone for a year and a half.  During that time, from 1992 to 1994, Mr. Burman studied English and attended the Advanced Software Analysis College, located in Brooklyn, where he earned a certificate in Medical Terminology Billing.

In 1994, his U.S. resident application was granted and his then-four-year-old son Alexander, mother, father, brother, and ex-wife Lyudmila Grigotchuk joined him in New York. Mr. Burman's former spouse remained in the United States for only a short time before returning to Ukraine, leaving Mr. Burman as the primary caregiver to his son.

From 1994 to 1995, Mr. Burman attended the POHS Institute of Insurance, located in Manhattan, where he obtained a license in Property and Casualty Insurance. Also, from 1994 to 1997, he worked for Fort Medical, a multi-specialty clinic located in Brooklyn. From 2001 to 2005, he worked at B & S Medical Supply. He opened Universal Supply Depot (a medical supply company) in 2005 and Sunlight Medical (a medical clinic) in 2007.  While both eventually were connected to fraudulent billing, Mr. Burman started each with good intentions, and operated them lawfully at the outset.

In 1996, Mr. Burman met and entered into a relationship with Julia Yusim, which lasted until 2003. She and Mr. Burman met when he helped her parents open a bakery in Brooklyn. The couple lived together but never married. During the seven years they were together, they had a daughter, J█████ now 15 years of age, who lives with her mother and stepfather in Staten Island. Mr. Burman spends almost every weekend with her, and shares a strong bond with her, as he shares with the rest of his family and many friends. (*See* Exhibit A).

In 2004, Mr. Burman met and married Marina. They remained together for approximately seven years. In 2010, they separated, and divorced in 2012. After four years, in 2014, when Mr. Burman's health started to deteriorate, Marina again began to live with him to take care of him, and the two ultimately reconciled. They have since remained together.

As noted by Mark Williams, LCSW, Mr. Burman has a strong commitment and sense of responsibility to his family: "Overall, what keeps him going is his love for his family: his parents and two children. Alex demonstrated his affection and true love for them when I had the opportunity to meet them. Alex was very proud to introduce me to them and during these encounters." (Exhibit B).

Mr. Burman's love for his family is also a constant theme in the letters to the Court. Allison Jumett met Mr. Burman while his mother was being treated for pulmonary disease at Coney Island Hospital, and was assigned to perform home health visits after Ms. Burman's release. She writes of Mr. Burman:

> I was deeply touched how involved and attentive Aleksandr was with his mother and came to know him personally. Alex was almost always present during my home visits for the entire time I was in charge of Mrs. Burman's care, which consisted of visits several times a month for the course of one year. I remember Alex bringing groceries, constantly checking in with me about his mother's health, and always bringing humor into the room. I later came to learn that he not only provided for his family's medical care, but also all of their financial needs and well-being in general.

9

(Exhibit C).

Mr. Burman continues to be the primary caretaker for his elderly parents. According to

his sister-in-law Rachel Burman:

> He visits them every Saturday and randomly during the week whenever he can. He helps them financially, he takes them for their doctor's appointments, assists them in daily living. His assistance is especially important for the parents because our family has relocated from United States to Canada in 2011 and […] Alex's brother Dmitriy is unable to stay close to their parents and meet their day-to-day needs.

(Exhibit D).

Michelle Vayman, who met Mr. Burman more than 11 years ago when they were next-

door neighbors in Staten Island, shares a similar story of Mr. Burman's commitment to family:

> Even with the short time we spent together, I could [see] what a wonderful father he was for his children. He was driving his son every day to school. […] He taught them the value of family and the need to take care of each other. I know his first wife, Lyudmila Burman. She lives alone. Alexander was providing food, clothing, medical care and all other needs even after their divorce. I know he was also taking care of his parents and always was on call, no matter how busy he was or time of day. Alexander established a long standing tradition in his family that every Saturday was a family day in his parents' house and always ensured that his children were present. This was an unbroken commitment to his parents.

(Exhibit E).

Mr. Burman's brother, Dmitriy, also describes Mr. Burman as a very dedicated father:

> His children (son Alex and daughter J████ have always taken priority in his life. […] Because of his efforts, Alex became an engineer and currently works for the New York City Transit Authority. Aleksandr meets his daughter J███ every weekend and they spend all day together. He tries to be involved in all stages of her life as much as he can. Aleksandr is a very caring son. He visits our parents weekly and he is highly involved in their needs, as they are now much older and need different support.

(Exhibit F).

Mr. Burman's care and dedication to his children is particularly evident in the letter from

his daughter J▮▮▮▮▮:

> [W]hen I have issues in my life I talk to my dad more than my mom, because he is a good listener. I love my Dad so much, and I know he loves me more than anything in the whole world.

(Exhibit G).

According to Marina Burman, Mr. Burman showed the same love and devotion to family

when it came to her daughters from her previous marriage:

> He assured me that he will be my daughters' father figure and he will treat them as [his] own, will never let me down and will always put them first in any case given. Up until today he has never broken his promise. From day one he has met them he fell in love with them just as much as he fell in love with me. My oldest daughter would have never graduated college if it weren't for my dear husband. She was struggling with various subjects but had always received help[] from Aleks. He motivated her to wake up every morning and continue doing what he believed she was doing best. She has now graduated Philadelphia College of Osteopathic Medicine and believes Aleks, her step dad, is the one to thank for it. […] My youngest daughter also had few struggles in school especially in her math class, she turned to my husband and me for help, mentioned hiring a tutor. Aleks didn't mind hiring a tutor but he offered his help first. After some time she had aced her exams a various of times and had no words on how to thank her step dad for helping her. He literally would leave work earlier to go help her with her studies and she strongly feels that he is smart and amazing guy and a father figure for her.

(Exhibit H).

Mr. Burman's compassion is not reserved just for his family. Many of the letters to the

Court recount acts of kindness that Mr. Burman performed for people from all walks of life.

When Allison Jumett told Mr. Burman that her father's leg had been amputated:

> Alex immediately offered his assistance. He went above and beyond, determined in helping him obtain a proper fitting leg prosthesis and orthopedic footwear. I was so grateful to him because it allowed my dad greater mobility and independence without pain. Alex did this on his own accord without ever expecting or accepting anything in return. It was then I saw the depth of his compassion and how much satisfaction he obtained from helping others.

(Exhibit C).

Mr. Burman was a customer at PC Richard and Son when he struck up a friendship with Eduard Kogan that has spanned 13 years. Mr. Kogan describes how Mr. Burman came to his aide in a time of need:

> Aleksandr Burman is a very loyal, kind, generous, and trusting person. Throughout our relationship, I have seen him put other people's needs before his own. As a matter of fact, when I got sick and had to have surgery, Aleksandr came to my house to check up on me. Upon arriving to my house, he saw the fridge was empty […]. […] He then excused himself and left. About an hour later, he came back with bags of groceries and loaned me money throughout a three month period to support myself as I was recovering.

(Exhibit I).

Ronnie Danilovich, who has known Mr. Burman for more than 40 years, tells a similar story of how Mr. Burman supported him during the most challenging time in his life:

> 12 years ago I had a horrible car accident and was bed ridden for almost a year. Alex was by my side with my wife and brother the entire time. He supported me and my family with anything we needed. I became very depressed that year and didn't know if I would ever be able to walk, work, and take care of my family again. Alex helped me get back on my feet and motivated me when I didn't believe I could ever recover. I will forever be grateful to him for being there for me in the toughest time of my life.

(Exhibit J).

Irina Gammir, a former employee of Mr. Burman writes that he:

> was very thoughtful. He allowed me to take time off to study for my exams and such which helped me much to graduate. […] I fell in love with another girl and had the most difficult time of my life disclosing that information to my family and friends. Alex was the only person who believed in me and convinced me to be myself and helped my parents accept me for who I am. Today my family believes in my decision and is fantastically supportive of me just like Alex is. He was the only person who supported me when nobody else felt the need to […].

(Exhibit K).

Aza Archakova shares another story of Mr. Burman's generosity:

> Aleks is the type of person who would give you the shirt off his back. When we once took a walk on a busy street together […] we saw two homeless kids and a dog sitting next to a corner deli asking for help and money. I saw Aleks eyes got watery and he gave the food he had gotten himself for lunch and cash to those two boys, later he found a store that sold dog food and gotten it for the homeless boys' pet. It didn't stop there, since the weather was chilly he ran into the first store he had found and bought two warm jackets for the boys. The kids were smiling and thanking him but I saw the pleasure Aleks had from helping the kids and yet the pain he felt that his help was way too small for them […].

(Exhibit L).

Ida Begelman lived in the building next door to Mr. Burman's office, and describes how he changed her life, despite being virtually a perfect stranger:

> One incident I will always remember when we had the hurricane storm Sandy. My building was located in one of the critical zones but I did not want to be evacuated. When the storm hit, our entire block was flooded. I was very scared because I was trapped in my apartment with no electricity. That evening Alex showed up with several people helping everyone out of the building and to a different location. There were shelters set up around the area. Alex took me to his home and absolutely insisted I stay with him and his family. I live[d] with them for months while my apartment was being fixed. He made me feel welcome, like family.

(Exhibit M).

Mr. Burman is a generous person who puts others' needs before his own. He is loyal and kind, and is a very dedicated father and son. The examples are many of a man with a good heart, who in spite of his flaws and his difficulties always has tried hard to help others and care for his family.

While we recognize the seriousness of the offense, and that this is not Mr. Burman's first crime, we believe that a sentence of 48 months' incarceration, followed by a three-year term of supervised release, would constitute a reasonable sentence as the Court undertakes to sentence the "whole person."

b.      *Nature and Circumstances of the Offense*

In his letter to the Court, Mr. Burman accepts full responsibility and demonstrates appropriate remorse for his misconduct:

> With this letter, I admit to, and take full responsibility for the crimes I have committed. Words cannot convey my remorse for the pain and suffering I've caused. I am so very sorry.

(Exhibit N).

While we do not seek to in any way minimize Mr. Burman's misconduct, we have sought to understand how an otherwise kind, hard-working and family-oriented man ends up here. Upon months of reflection, it is our sincere belief, that the details of Mr. Burman's history and characteristics are intimately connected to the nature and circumstances of his offense.

This is evident from Mr. Burman's self-reflective letter to the Court:

> When I began developing Sunlight Medical, I really did have good intentions. I wanted to establish a state-of-the-art facility with exceptional physicians, nurses, and physical therapists, to provide excellent care for people in my community. My inclinations, of course, were not entirely altruistic—I wanted to be respected, and compared favorably to my brother, Dmitry, who is a renowned, double board-certified pediatrician in Canada. I, unfortunately, was completely out of my depths. I lacked the tools, the expertise and perhaps the temperament, to execute my vision. I took shortcuts. I made poor decisions, often against the advice of those more knowledgeable than myself. And, instead of owning up to my failures, I tried to self-medicate them away with Oxycontin, Percocet, and Vicodin.
>
> I am an addict. For the past 20 years, since 1997, I have struggled with and tried to cover up a disease that took hold over me, despite the efforts of friends, family, well-intentioned professionals, and even the mercy of the legal system. I am not a stupid man; I have noticed the direct correlation between the mounting chaos in my life and my growing habit. In retrospect, it was inevitable and only a matter of time before my life came crumbling down. The drugs at first dulled, and then began to silence the alarms and red flags that warn us from making poor choices. I don't say this to try to make excuses for my misconduct, because there are none. I lost sight of my good intentions and became consumed with succeeding, whatever it took. Now, I am grateful and relieved that I was stopped, and given the opportunity to see the error of my ways.

(Exhibit N).

Mr. Burman was prescribed opioids in 1997 following a dental operation. He quickly developed a dependence, and began abusing the narcotics. Eventually, when he was unable to convince doctors to continue writing prescriptions, he resorted to heroin as a substitute. In 1999, he sought inpatient treatment at Cornerstone Medical Arts.

Sadly, he was unable to escape the grip of his addiction, and has since been battling it. Unfortunately, his chronic medical conditions have necessitated prescriptions for opioids, which have led to cycles of dependency. When unable to obtain opioids, Mr. Burman has resorted to heroin use.

In addition to the two inpatient programs at Cornerstone Medical Arts, Mr. Burman has, over the years, undergone inpatient treatment at various other rehabilitation programs, including a variety of clinics located in Pennsylvania.  Here are some of them: Clarity Way Drug and Alcohol Rehabilitation Center, located in Hanover, PA; Retreat at Lancaster County, located in Ephrata, PA; and Caron Treatment Center, located in Wernersville, PA. One of these inpatient stays followed a positive drug test while on pretrial release from Mr. Burman's previous case (*United States v. Burman*, 01-CR-871(DAB)). In addition, Mr. Burman was prescribed Suboxone for the dual purpose of treating his anxiety as well as aiding in his fight against addiction.

Mr. Burman's drug use often has correlated with periods of high stress and has translated into a destructive pattern of self-medication. It has gone hand-in-hand with his battle with anxiety and depression, with which he struggled since he was a young man and which has worsened as his medical condition has deteriorated and he has failed professionally and personally.

According to Mark Williams, LCSW:

In attempting to understand how someone like Alex resorted to the criminal behavior for which he has taken responsibility, two things stand out, which in no way excuse his conduct, but which I believe help to explain it. First, Alex is an addict. He fell into a pattern of self-medicating, which affected his ability to make the right choices both in his personal life and business dealings. Second, his background growing up in Ukraine and Latvia, where his family was always struggling to get by, under the weight of anti-Semitism or anti-soviet bias, always viewed as outsiders, imbued Alex with a feeling that he could never have enough financial security for his family.

(Exhibit B).

This is corroborated by board certified psychiatrist Dr. John Docherty:

To the best of my medical judgment, it is my opinion that the behavior involved in Mr. Burman's offenses was materially influenced by the combined effects of the iatrogenically induced opioid addiction and dependency, the deleterious effects of his chronic and persisting pain, the debilitating effects of his multiple chronic illnesses and the severe, recurrent and treatment-resistant state of major depression. These together had a combined effect to compromise his judgment and decision-making.

(Exhibit O).

While Mr. Burman was not affected to the high degree that others suffered as a result of the Chernobyl disaster, some interesting studies are worth noting. The World Health Organization cites mental health concerns, especially issues that appear at the sub-clinical level, as one of the major health consequences of Chernobyl.[2] The exposed population demonstrated anxiety levels twice as high as the control population in one study.[3] And, taken together with the breakup of the Soviet Union and resulting political turmoil and social unrest, Chernobyl has been linked not only to anxiety and depression, but also to substance abuse and reckless behavior.[4]

---

[2] *See* World Health Organization: Health effects of the Chernobyl accident: an overview (2006), http://www.who.int/ionizing_radiation/chernobyl/backgrounder/en/.
[3] *See* Sarah Kleinfeld, Health Consequences of Chernobyl (2009), http://faculty.virginia.edu/metals/cases/kleinfeld3.html
[4] *See* WHO, *supra*; Greenpeace International, The Chernobyl Catastrophe: Consequences on Human Health (2006), http://www.greenpeace.org/international/Global/international/planet-2/report/2006/4/chernobylhealthreport.pdf

This does nothing to excuse Mr. Burman's conduct, and he recognizes that he is solely to blame for his choices. We believe, however, that Mr. Burman's anxiety, depression, struggles growing up, drug addiction during the instant offense, and serious medical conditions, provide mitigation, and help explain how Mr. Burman comes to be before the Court.

And while Mr. Burman's role as a supervisor and the years-long duration of his participation in the instant offense no doubt warrant punishment, it is worth noting that the lion's share of Mr. Burman's guideline's calculation is based on a 20-point loss enhancement, which courts in this circuit routinely have criticized for the overly harsh sentencing regime they have created. *See United States v. Corsey*, 723 F.3d 366, 380 (2d Cir. 2013) ("The history of bracket inflation directed by Congress renders the loss guideline fundamentally flawed, especially as loss amounts climb. The higher the loss amount, the more distorted is the guidelines' advice to sentencing judges."); *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d Cir. 2014) ("By making a Guidelines sentence turn, for all practical purposes, on this single factor [(amount of monetary loss)], the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face."); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (sentencing a defendant to 42 months in prison where the loss amount was greater than $50 million and involved more than 250 victims and holding that "the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense").

No detail or opinion we offer the Court is meant to try to excuse the fact that Mr. Burman committed a crime. We bring this information to the Court with the sole intention of trying to

impress upon Your Honor: (1) the context within which Mr. Burman committed the offense, and (2) the harshness inherent in relying on the guidelines as the Court considers a sufficient sentence.

## VI.    Remaining Factors of 18 U.S.C. §3553(a)

*a.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, to Promote Respect for the Law, to Provide Just Punishment for the Offense, and to Avoid Unwarranted Sentence Disparities*

As the Court reflects upon the person being sentenced, we urge Your Honor to consider that a sentence of 48 months can reflect the seriousness of the offense, promote respect for the law, provide just punishment, and avoid unwarranted sentence disparities.

Mr. Burman regrets what he did. This misconduct, however, does not fully portray the whole person being sentenced. Mr. Burman has proven to a community of people that, notwithstanding his serious misconduct, he is a caring and thoughtful person, who genuinely wants to help others.

Anna Andryeyeva, who met Mr. Burman 10 years ago writes:

> He always showed love[] for others and has helped many people around him. Any issues I had he was there to help and advise me. [He] [c]ared for me and my family throughout the years. […] Aleks stood by me and my family through the[] darkest moments and was a great supporter and a friend at that time. The person who helped me get through it all was Aleks. The only person I can thank for not letting me down through hardships is him. And I will forever along with my family [] be grateful to him for that.

(Exhibit P).

According to Lioudmila Zaloguina, who has known Mr. Burman for the last six years, he "is well regarded by all who know him. He is loyal, honest, considerate, and supportive

individual who has the ability to see and understand things from another's perspective." (Exhibit Q).

Michelle Vayman shares: "Even during difficult times, people who know Alexander can say he is very loyal, loves his family, supportive of friends and relatives, brings happiness to people unconditionally, and is always there to help in a variety of situations as much as he is able to and more." (Exhibit E).

Dmitriy Gordon similarly writes:

> Aleks has a big heart […]. He has been a very good and helpful friend who always came through whenever he was asked to. He even helped me save my family when I [had] ongoing personal issues with my wife. I have known Aleks for a long time, and he always [strives][sic] to become a better person […] , he has always been a very helpful person and once he sets his mind to help someone he does it with dedication and sheer force of will.

(Exhibit R).

According to Marina Burman:

> He has always made sure people feel comfortable around him and was very generous with everyone who crossed his path. He has reached out to so many souls and touched so many people's lives because of his niceness and honesty that he carries with him at all times. […] I can confirm that he is a man of great integrity, extremely dedicated to his family and work and entirely peace loving. I am very proud to be his wife.

(Exhibit H).

Anna Samuel similarly shares: "Alex taught me a great deal about life, and about myself, and I believe I am a better, more tolerant person because of him. He is one of the most sensitive, bright, and compassionate people I have ever known." (Exhibit S).

And Lolita Kalinova writes: "I just feel that [it] is amazing that [a] person cares so much for other people. […] [H]e has a heart of gold. […] People like Aleksandr Burman are very hard to find. Somebody with a huge heart and car[ing] [sic] so much for others." (Exhibit T).

The letters written to the Court demonstrate that the requested sentence will promote respect for the law and provide just punishment to Mr. Burman. These community members are but a fraction of the people who support Mr. Burman.[5] They know how serious this case is, and that the law carries the power to severely punish Mr. Burman, yet they urge the Court to exercise lenience.

Additionally, the requested sentence would not result in a disparity. An evaluation of the United States Sentencing Commission's Sourcebook of Federal Sentencing Statistics for Fiscal Year 2015 is revealing in this regard. Of the 3,813 defendants sentenced in the Second Circuit in 2015, only 1,098 (28.8%) received a within-the-guidelines sentence, while 1,622 (42.5%) received non-government sponsored below range sentences.   (*See* Exhibit U). Of the 1,646 defendants sentenced in the Southern District of New York in 2015, only 387 (23.5%) received a within-the-guidelines sentence, while 808 (49.1%) received sentences below the Guidelines minimum sentence based solely on *Booker* and the factors of 18 U.S.C. §3553(a). (*See* Exhibit U). Furthermore, of the 305 defendants sentenced for fraud offenses in the Southern District of New York in 2015, the median sentence of imprisonment was 21 months and the average sentence was 30 months. (*See* Exhibit U).

b. *The Requested Sentence Can Provide Adequate Deterrence, and Protect the Public from Future Offenses by Mr. Burman*

A 48-month sentence can provide general and specific deterrence.

There is no empirical data that proves that the imposition of a prison sentence accomplishes general deterrence.[6] Nonetheless, the requested sentence sends a powerful message

---

[5] Additional letters not quoted herein are attached as Exhibit W.

[6]   Valerie Wright, Ph.D., "Deterrence in Criminal Justice," The Sentencing Project (November 2010)(http://www.sentencingproject.org/doc/deterrence%20briefing%20.pdf)("...the studies reviewed do not provide

to the community that crime will not be tolerated.  It will provide specific deterrence while Mr. Burman is incarcerated for the next 48 months, followed by years of supervised release.

However, for a multitude of reasons, we do not believe that Mr. Burman needs to be specifically deterred beyond the requested sentence.

Dmitriy Gordon shares his observation of his longtime friend: "It has been trying times but we […] see that he is making a sincere effort to pull his life back together in order to be able to provide love and sustenance to his family." (Exhibit R).

According to Rachel Burman: "I strongly believe[] that Alex deeply regrets his mistakes and he is willing to change his life and to repay the debt[] that he owes to [] society." (Exhibit D).

Aza Archakova writes: "I can tell when someone is being sincere in his or her desire to change or to account for wrongdoing, and I am certain this is the case with my dear friend." (Exhibit L).

Anna Andryeyeva shares: "Alex has made a mistake and he is incredibly remorseful and is willing to do whatever it takes to make reparations if possible." (Exhibit P).

And Anna Samuel writes: "I know that this is someone worth saving, and that with a lot of work and treatment, he will use his remarkable talents of skill, intellect, and compassion to live out the rest of his life for the sake of others, something he was meant to do all along." (Exhibit S).

Mr. Burman's desire to change, and his remorse for his actions was also evident to Mark Williams, LCSW, who concludes:

---

a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"), quoting Andrew von Hirsch, Anthony Bottoms, Elizabeth Burney, and P-O. Wikstrom, "Criminal Deterrence and Sentence Severity: An Analysis of Recent Research," Oxford: Hart Publishing (1999).

> Alex expressed a willingness to engage in counseling, rehabilitation, anything to help him become a better person, and begin the process of redeeming himself in the eyes of his family, friends and community. […] I believe in his prospects for recovery, and to lead a positive and meaningful life. I am encouraged by his honesty and remorse and his desire to change and develop greater psychological strength and self-awareness, especially by staying sober. He has a long road ahead physically and mentally, but with proper treatment and counseling, I believe in his chances to be a positive contributor to the community once again. […]

(Exhibit B).

What is evident from the letters, and from Mr. Burman's interactions with all those who meet him, is that he is truly sorry for his actions and serious about changing his life for the better. The letters also demonstrate that Mr. Burman has a strong group of family and friends who are willing to support him upon his release from prison.

Mr. Burman has learned a very difficult lesson from this experience and will carry it with him for the remainder of his life. He has shown, both by his actions since his arrest and his self-reflective letter to the Court, that he is truly remorseful for the choices that he made, and that he is invested in transforming his life:

> I have two children -- my 15-year-old daughter, J▮▮▮▮, and my son, Alexander, who is now already a young man at 27. I'm so filled with shame and disappointment at the example I've shown them. I want to be someone they can admire, to be a good man. A father should teach his children to take responsibility for their mistakes. I want to show them that I am taking responsibility for mine, and trying to make amends. […] I want to devote my remaining time on this earth to helping other people, and showing my children what it means to live the right way. […] I am determined to be a better father, a better husband, a better person. I know that I can make a positive difference if given a chance.

(Exhibit N).

We believe that Mr. Burman, with the right treatment and counseling, his strong family support, and his desire to be present for his children and elderly parents, has the potential to succeed. Mr. Burman is willing to engage in whatever is necessary to help him move forward

with his life in a healthy and productive way. To that end, he has proactively sought assistance

from the Aleph Institute, a non-profit organization dedicated to assisting and caring for the

wellbeing of members of specific populations that are isolated from the regular community,

including prisoners, and those suffering from mental illness or addictions.  Aleph has connected

Mr. Burman with Rabbi Y. Weiss, for engagement in preventive-education and faith-based

rehabilitation.

And according to Dr. Docherty, Mr. Burman is a good candidate, with the proper

treatment, to rehabilitate himself and contribute positively to the community:

> In his current sober state Mr. Burman appears to comprehend the errors of his
> judgment and evinces sincere regret. He further recognizes the destructive role
> that opiate use has played in the choices he made. To stabilize his state and ensure
> his recovery Mr. Burman will require ongoing addiction rehabilitation treatment
> and psychiatric care and comprehensive pain management in a well-established
> clinic that can provide access to the full range of non-opioid interventions he
> needs to sustain his recovery. Concomitantly he will require continuous treatment
> of his multiple chronic medical illnesses. With such treatment, his fundamental
> sense of responsibility and the presence of a supportive social and familial
> network provide the basis for a positive prognosis and a low risk of recidivism.

(Exhibit O).


c.    *Vulnerability Mr. Burman Will Face in Prison Due to His Age and Health*

The Department of Justice produced a study in 2004 entitled "Correctional Health Care:

Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates". The DOJ found

that older inmates suffer emotional distress and physical deterioration at a higher rate, which in

turn, causes them to age more quickly than people of their age outside the prison system.  *See*

"Correctional Health Care: Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill

Inmates," United States Department of Justice, National Institute of Corrections (February 2004),

pp. 8-9.

The few reliable longitudinal studies of elderly inmates that have measured group-specific and overall health and functional status have revealed that these conditions accelerate the aging process to an average of 11.5 years older than the inmate's chronological age after age 50. *See id.*, p. 10.

Not only does a prison's concrete and steel create conditions that are experienced more harshly by older inmates, but several factors speed the aging process in prison, including: "the amount of stress experienced by new inmates trying to survive the prison experience unharmed; efforts to avoid confrontations with correctional staff and fellow inmates; [and] financial stress related to inmates' legal, family, and personal circumstances." *Id.*, p. 8.

This is especially troublesome for inmates:

> who may be frail and therefore vulnerable to the threats of assault by younger predatory inmates, [as it] contributes to the emotional stress and physical deterioration they routinely experience.

*Id.*, p. 9.

The study also noted the tension that exists between proper medical care and incarceration, an issue that affects many older inmates:

> In the tradition of the Hippocratic oath, medical practitioners concern themselves with 'doing no harm,' and with comfort, reassurance, and teaching. [...] Moreover, medical care is delivered in the context of informed choices, selectivity, and securing of patient satisfaction.  On the other hand, prisons are authoritarian institutions, organized as hierarchies that tend to focus on expedient, time-honored, standardized solutions to problems. Prisons, furthermore, are defined by the imperatives of custody and control.  Following the dictates of public safety and security, corrections officials concern themselves rather with 'allowing no harm,' with neutralizing threat, containment, and, on occasion, punishment.  Prisons are alien and intimidating to the sensitivities and vulnerabilities of old age and illness.  In short, providing care in prison settings poses significant challenges to ethical and effective medical practice.

*Id.*, p. 48.

Mr. Burman is 55 years of age, and suffers from myriad medical conditions, including:

(1) Type II Diabetes;

(2) Hypertension;

(3) Hepatitis C; and

(4) Depression.

(*See* PSR, p. 14, ¶ 59).

He is prescribed, and takes daily, as many as 12 different medications for his various medical conditions:

(1)     Janumet 50/1000 mg – For Diabetes

(2)     Amaryl 4 mg – For Diabetes

(3)     Toujeo 50 units – For Diabetes

(4)     Humalog 10-15 units – For Diabetes

(5)     Metformin 1000mg – For Diabetes

(6)     Azor 10-40mg – For Hypertension

(7)     Bystolic 20mg – For Hypertension

(8)     Clonodine 0.2mg – For Hypertension

(9)     Losartan 50mg – For Hypertension

(10)     Carvedilol (beta blocker) 25mg – For Hypertension

(11)     Quinapril 40mg – For Hypertension

(12)     Suboxone 8mg – For Anxiety/Opioid Addiction

(*See* PSR, p. 14, ¶ 60).

In addition to the social vulnerabilities Mr. Burman will face fitting into the prison environment as an older inmate, he also faces physical vulnerabilities associated with his age and declining health. (*See* Exhibit V). Because of the confined nature of the prison environment, the close contact with other inmates, the lack of ventilation, a poor diet and inadequate exercise, and limited medications and health care accessibility, Mr. Burman will feel the effects of the prison environment more acutely than younger and healthier inmates.

According to Ronnie A. Hershman, M.D., who has been treating Mr. Burman since December 2015: "an extended prison term would be detrimental to his health with risks of rises in blood pressure that could lead to stroke and heart attack." (Exhibit V).

Further, there remains a great deal of uncertainty in the medical community about the long-term effects of the Chernobyl disaster on the health of those exposed to radiation. With many fundamental questions remaining unanswered, it is difficult to determine the ongoing effects on someone like Mr. Burman, and how they may affect his medical needs while incarcerated. According to Mr. Burman, 82% of his high school classmates have already died, and as Dr. Docherty notes, Mr. Burman's "complex series of serious chronic illnesses reflect[s] significant premature aging." (Exhibit O).

In light of these concerns, the proposed sentence of 48 months incarceration would punish Mr. Burman while limiting the emotional stress and physical deterioration he is likely to endure, and the additional financial strain on an already overburdened Bureau of Prisons.

## VII.   Conclusion

On behalf of Mr. Burman and his family, we thank the Court in advance for taking the time to consider our sentencing submission. We look forward to addressing the Court during the sentencing hearing on May 3, 2017.

Dated:          New York, New York
                April 3, 2017

                                        Respectfully submitted,


                                        */s/ Edward V. Sapone*
                                        Edward V. Sapone
                                        Counsel for Defendant
                                        Aleksandr Burman

cc:     AUSA David Raymond Lewis

27