UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| -against- | **ORDER** |
| ALEKSANDR BURMAN, | 16 Cr. 190 (PGG) |
| Defendant. | |

PAUL G. GARDEPHE, U.S.D.J.:

        On March 18, 2016, Defendant Aleksandr Burman pled guilty to conspiracy to commit health care fraud and wire fraud (Information (Dkt. No. 2) Count One), health care fraud (id. Count Two), and committing an offense while on pre-trial release. (Id. Count Three; PSR at 2, ¶¶ 2-4)

        On May 10, 2017, this Court sentenced Burman to 100 months' imprisonment on Count One and 100 months' imprisonment on Count Two, with those terms to run concurrently. The Court imposed a sentence of 20 months' imprisonment on Count Three, to run consecutively to the sentences imposed on Counts One and Two. (See Judgment (Dkt. No. 49) at 2; Sentencing Tr. (Dkt. No. 50) at 58) Burman was remanded and began serving his sentence on May 10, 2017. (Sentencing Tr. (Dkt. No. 50) at 60)

        Burman is currently being held at a satellite federal prison camp associated with the Federal Correctional Institution in Fairton, New Jersey (the "Fairton Camp"). (Def. Br. (Dkt. No. 79) at 4) According to Burman, the Bureau of Prisons ("BOP") has calculated his release date – assuming good time credit – as November 14, 2025. (Id. at 5)

        On April 8, 2020, Burman "submitted to his [BOP] case manager a request for a sentence reduction in light of his vulnerability to the COVID-19 pandemic. Mr. Burman

followed up on this request electronically on April 28, 2020 and again on May 2, 2020." (Id.) On April 30, 2020 – pursuant to 18 U.S.C. § 3582 – defense counsel submitted a request for a sentence reduction to the warden of FCI Fairton. In the alternative, counsel sought a furlough pursuant to 18 U.S.C. § 3622. (Id. at 5-6; Taylor Decl., Ex. A (Dkt. No. 80)) On May 6, 2020, defense counsel submitted additional information to the warden concerning Burman's medical condition and residence options if he were released. (Def. Br. (Dkt. No. 79) at 6; Taylor Decl., Ex. B (Dkt. No. 80)) On May 12, 2020, BOP denied Burman's request for a sentence reduction. (Def. Br. (Dkt. No. 79) at 6)

On May 20, 2020, Burman filed a motion seeking compassionate release, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), given his "serious medical conditions, including severe hypertension, diabetes, spinal stenosis and blindness in one eye from a detached retina." Burman argues that as a result of his medical conditions he is especially vulnerable to the COVID-19 virus, and that the "conditions at FCI Fairton" make social distancing and hand hygiene "impossible." (Def. Br. (Dkt. No. 79) at 4, 12) Burman contends that his sentence should be reduced to "time served, followed by a period of supervised release with the condition of home confinement for an appropriate period of time." (Id. at 25)

The Government opposes Burman's application, arguing that "there continues to be a strong need her[e] for both general deterrence and specific deterrence." (Govt. Opp. Br. (Dkt. No. 82) at 19-20) The Government notes that although FCI Fairton has seen 17 inmates test positive for COVID-19, Burman is not being held at that facility. Burman is instead being held at the Fairton Camp, "which is wholly quarantined from the larger FCI Fairton facility." The Fairton Camp – which contains only 76 inmates – has no known cases of COVID-19, either among inmates or staff. (June 10, 2020 Govt. Ltr. (Dkt. No. 86)) While Burman contends that


"correctional officers who work at the camp regularly pass between the camp and the main facility" and that "the two facilities share one medical staff" (June 12, 2020 Def. Ltr. (Dkt. No. 87) at 1), he does not dispute that no inmate or staff member of the Fairton Camp has tested positive for the COVID-19 virus.

For the reasons stated below, Burman's application will be denied.

## DISCUSSION

### I.     LEGAL STANDARD

The compassionate release statute – 18 U.S.C. § 3582(c)(1)(A)(i) – provides that a court may

> upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf . . . , reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction. . . .

18 U.S.C. § 3582(c)(1)(A)(i).

Pursuant to this statute, a defendant seeking compassionate release must "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf," or "30 days [must have lapsed] from the receipt of such a request by the warden of the defendant's facility." 18 U.S.C. § 3582(c)(1)(A).

A court considering an application for compassionate release must weigh the sentencing factors set forth in 18 U.S.C. § 3553(a); determine whether there are "extraordinary and compelling reasons [that] warrant such a reduction"; and consider whether a sentencing "reduction is consistent with applicable policy statements issued by the Sentencing Commission." (Id.)

3

## II. ANALYSIS

### A. Exhaustion of Administrative Remedies

BOP has denied Burman's request for compassionate release. (Def. Br. (Dkt. No. 79) at 6) The Government contends that there is an administrative appeal process that Burman has not exhausted. (Govt. Opp. Br. (Dkt. No. 82) at 12) Assuming arguendo that that is true, Burman first petitioned BOP for compassionate release on April 30, 2020, and the date is currently June 13, 2020. Because more than thirty days have passed since Burman petitioned BOP for compassionate release, he is deemed by statute to have exhausted his administrative remedies. See 18 U.S.C. § 3582(c)(1)(A).

### B. Section 3553(a) Factors

18 U.S.C. § 3553(a) directs a sentencing court to consider

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for –

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .

(5) any pertinent policy statement—

> (A) issued by the Sentencing Commission pursuant to section
> 994(a)(2) of title 28, United States Code, subject to any
> amendments made to such policy statement by act
> of Congress (regardless of whether such amendments have yet
> to be incorporated by the Sentencing Commission into
> amendments issued under section 994(p) of title 28) . . .
>
> (6) the need to avoid unwarranted sentence disparities among defendants
> with similar records who have been found guilty of similar conduct; and
>
> (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

In the Presentence Report, the Probation Department recommends a sentence of 168 months, which is at the bottom of its calculated Sentencing Guidelines range of 168 to 210 months' imprisonment. (PSR at 23)

At sentencing, the Court concluded that the actual Guidelines range was 188 to 235 months' imprisonment.[1] The Court nonetheless found that the range the parties had stipulated to in the plea agreement – 135 to 168 months' imprisonment – was "adequate." (Sentencing Tr. (Dkt. No. 50) at 16) The Government sought a sentence within the stipulated Guidelines range of 135 to 168 months' imprisonment. (Id. at 51) Defense counsel argued for a variance down to 48 months' imprisonment. (Id.)

The Court carefully considered the Section 3553(a) factors at sentencing. As to the instant offense, Burman exploited a "Medicare program [that] is vulnerable to fraud," and caused "actual losses of $17 million to Medicare and $9 [million] to Medicaid," with a "total

---

[1] The plea agreement's Guidelines stipulations include a 20-level enhancement for loss amount, which is premised on a loss of $16 million to $18 million. Additional information concerning loss became available prior to sentencing, however, which led the Probation Office to calculate a loss amount of approximately $26 million, which corresponds to a 22-level enhancement. This Court agreed with the Probation Office's loss amount calculations. (Sentencing Tr. (Dkt. No. 50) at 3-4, 14-16)

intended loss [that] appears to exceed $32 million . . . ." (Id. at 47-48) Burman perpetrated his massive health care fraud scheme though six clinics that he owned and operated in Brooklyn. His clinics employed dozens of people, including doctors, therapists, other medical personnel, and administrative staff. (Id. at 47)

The Court noted that "what is truly astounding about this case is the fact that Mr. Burman's crimes were committed after he had been arrested on another [health care fraud] case," and become a cooperating witness. Burman's prior convictions for mail, wire, and health care fraud arose from his role as the manager of a fraudulent medical clinic between 1997 and 2002. (Id. at 48, 50) While serving as a Government cooperator in that case, Burman was engaged in massive Medicare and Medicaid fraud – conduct that provides the basis for the charges in the instant case. As a result of his cooperation and the lies he told the judge at sentencing, Burman obtained a sentence of two years' probation in his earlier case. (Id. at 52)

In seeking a non-incarceratory sentence in his prior case, Burman said the following to the sentencing judge:

> Your Honor, I was a fool to commit this crime. I know I did everything that I can possibly do for the last 12 years to convict people I worked for. Please permit me to move forward with my life, take care of my family, live responsibly, and I promise you will never see me on the wrong side of the law again. Thank you for your time and consideration.

(PSR at 25) Incredibly, at the very moment that Burman made this plea to the judge at his March 2012 sentencing, he was engaged in a massive Medicare and Medicaid fraud scheme, perpetrated through the six clinics that he owned and operated in Brooklyn.

This Court concluded that Burman's "prior encounter with the criminal justice system provided no deterrence at all," and that he presented an extremely high risk of recidivism. (Sentencing Tr. (Dkt. No. 50) at 52)

6

Finding that a substantial period of incarceration was necessary to ensure both specific and general deterrence, the Court granted a modest variance from the parties' stipulated Guidelines range of 135 to 168 months' imprisonment, and imposed an aggregate sentence of 120 months' imprisonment. (Id.)

Analysis of the Section 3553(a) factors counsels against granting Burman's application for compassionate release. Burman committed the instant offense while awaiting sentencing in another health care fraud case. He lied to another federal judge, and thereby obtained a probationary sentence that had no deterrent effect. Moreover, the ten-year sentence imposed by this Court represents a significant reduction from (1) the actual Guidelines range of 188 to 235 months' imprisonment; and (2) the parties' stipulated Guidelines range of 135 to 168 months' imprisonment. Of the ten-year sentence the Court imposed, Burman has served only three years.

In sum, analysis of the Section 3553(a) factors does not suggest that a reduction in sentence is appropriate.

### C. "**Extraordinary and Compelling Reasons**"

In order to prevail on his compassionate release motion, Burman must demonstrate that "extraordinary and compelling reasons warrant . . . a reduction" in his sentence, and that any reduction that is granted comports with "applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A).

Congress tasked the Sentencing Commission with providing guidance to courts regarding the application of the compassionate release statute. See 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered

7

extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. . . ."); United States v. Ebbers, No. (S4) 02 Cr. 1144-3 (VEC), 2020 WL 91399, at *4 (S.D.N.Y. Jan. 8, 2020); see also United States v. Hernandez, No. 18 Cr. 834 (PAE), Dkt. No. 451.

The Commission's policy statement and commentary concerning Section 3582(c)(1)(A) state that a court may reduce a sentence for "extraordinary and compelling reasons," including where the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13(1)(A) & cmt. n.1(A).

Finally, a defendant seeking compassionate release must demonstrate that his release will not present a danger to the community. U.S.S.G. § 1B1.13(2)-(3).

Here, Burman – who is 58 years old – argues that he should be released from prison because "his underlying medical conditions, which include uncontrolled hypertension and diabetes, [create] the very real possibility that exposure to the novel coronavirus will kill him in prison." (Def. Br. (Dkt. No. 79) at 21)

The Government acknowledges that "as many as three of defendant's medical conditions – diabetes, coronary artery disease, and at least some form of hypertension – have been recognized by the CDC as conditions that 'may put people at higher risk of severe illness' if they were to contract COVID-19." (Govt. Opp. Br. (Dkt. No. 82) at 15) The Government argues, however, that no inmate or staff member of the Fairton Camp where Burman is being held has tested positive for the COVID-19 virus. (June 10, 2020 Govt. Ltr. (Dkt. No. 86)) The Government further argues that this Court should consider the "strong need her[e] for both

general deterrence and specific deterrence" as well as "the seriousness of [D]efendant's offense," noting that a release to home confinement "would allow Burman to largely escape the appropriate sentence imposed by this Court three years ago, and would come on top of Burman's previous conviction, in which he eluded incarceration through his duplicitous misuse of a cooperation agreement." (Govt. Opp. Br. (Dkt. No. 82) at 19-21)

There is no question that COVID-19 presents an enormous risk to inmates. See United States v. Stephens, 2020 WL 1295155, at *2 (citing United States v. Raihan, No. 20-cr-68 (BMC) (JO), Dkt. No. 20 at 10:12–19 (E.D.N.Y. Mar. 12, 2020)). And Burman has demonstrated that he suffers from medical conditions that put him at special risk. Individuals with diabetes and serious heart conditions "might be at higher risk for severe illness from COVID-19." Coronavirus Disease 2019 – People Who Are at Higher Risk, Centers for Disease Control and Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/underlying-conditions.html (last accessed June 13, 2020). Moreover, for those who contract COVID-19, a history of hypertension has been associated with "increased illness severity and adverse outcomes." Coronavirus Disease 2019 – Clinical Care Guidance, Centers for Disease Control & Prevention, https://www.cdc.gov/coronavirus/2019-ncov/hcp/clinical-guidance-management-patients.html (last accessed June 13, 2020).

But the information provided by the Government – current as of three days ago – demonstrates that the Fairton Camp where Burman is being held has experienced no reported cases of COVID-19 in either the inmate or staff population. And the risk that the virus presents to Burman must be balanced against the "very high risk of recidivism" that the Court cited at sentencing.

As discussed above, a defendant seeking compassionate release must demonstrate that his release will not present a danger to the community. U.S.S.G. § 1B1.13(2)-(3). This Court cannot make such a finding here. Burman was not deterred by his 2012 sentence of probation, and there is no reason to believe that he will remain law abiding after serving only a third of the ten-year sentence imposed by this Court on May 10, 2017. Home confinement cannot ensure that Burman will not engage in future criminal conduct. As the Court noted at sentencing, frauds of the sort perpetrated by Burman "are hard to detect and prosecute," and so "the sentence imposed must be sufficient to deter conduct of this sort." (Sentencing Tr. (Dkt. No. 50) at 47) Burman's repeated serious criminal conduct – committed while cooperating with the Government in connection with an earlier health care fraud case – and the lies he told to the sentencing judge in order to obtain his probation sentence, demonstrate that home confinement is not sufficient to prevent Burman from committing future crimes. Moreover, there is no reason to believe that the three years of incarceration Burman has served to date will be sufficient to deter him from committing future crimes.

## **CONCLUSION**

Although the COVID-19 pandemic is an extraordinary event that presents a clear and present danger to both inmates in prison and our society as a whole, the Court finds that extraordinary and compelling reasons do not exist to justify Burman's release to home confinement. Accordingly, Burman's application for compassionate release is denied. Given the rapidly evolving nature of this health crisis, however, and the challenges it poses to prison facilities, see Federal Defenders of New York, Inc. v. Federal Bureau of Prisons, No. 19-1778, slip op. at 26-27 (2d Cir. Mar. 20, 2020), his motion is denied without prejudice to renewal in the

event that circumstances materially change.

Dated: New York, New York
 June 13, 2020

<div style="text-align: right;">
SO ORDERED.

*[signature: Paul G. Gardephe]*

Paul G. Gardephe
United States District Judge
</div>